Judge Robert S. Lasnik

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR18-255 RSL |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| MARC SAPATIN, | |
| Defendant. | |

Comes now the United States of America, by and through Tessa M. Gorman, Acting United States Attorney for the Western District of Washington, Francis Franze-Nakamura and Andrew C. Friedman, Assistant United States Attorneys for said District, and Anthony Teelucksingh, Trial Attorney, Computer Crimes & Intellectual Property Section, Department of Justice, and files this Government's Sentencing Memorandum.

## I. INTRODUCTION

Defendant, Marc Sapatin, is before the Court for sentencing following his guilty plea to one count of conspiracy, in violation of 18 U.S.C. § 371, and one count of conspiracy to commit money laundering, in violation of 26 U.S.C. § 1956(h). Sapatin is scheduled to be sentenced at 10:00 a.m. on September 10, 2021.

GOVERNMENT'S SENTENCING MEMORANDUM - 1
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## II.   BACKGROUND

**A. The Cellular Telephone Unlocking "Industry"**

Locking software is disabling software, present when a cellular telephone initially is sold, that limits the phone to being used on a particular cellular telephone network. *See* Information ¶¶ 4-5. At all relevant times, AT&T, like other cellular phone companies, installed locking software on cellular phones, because AT&T typically sold cellular phones either at highly subsidized prices, or on installment plans. *See id.* ¶ 3. AT&T counted on recovering the cost of cellular phones, typically many hundreds of dollars, as part of the payments that customers made under service plans, or as expressly denominated installment payments under installment plans for the purchase of phones. *See id.*. Both service plans, and installment plans typically had two-year terms.

As cellular telephones have proliferated over the last two decades, a substantial "industry" has developed based on the illegal unlocking of cellular telephones. In many cases, this is accomplished by bribing employees of cellular telephone companies to unlock cellular telephones that are not eligible for unlocking, or by hacking into cellular telephone companies' computer systems and using the resulting access to unlock cellular telephones that are not eligible for unlocking. When cellular telephones are improperly unlocked, cellular telephone companies like AT&T often incur significant losses. *See id.* ¶ 8.

First, customers who have unlocked their cellular telephones often walk away from the service plans or installment plans that covered the cost of their phones (and instead enter into new service contracts with different companies). In such cases, the original cellular telephone company loses the remaining portion of the cost of the cellular telephone. *See id.* ¶ 7. This may be as much as the entire cost of a phone, where a customer obtained the phone with the intent of immediately unlocking it.

Second, there is a large market in stolen cellular telephones. To have value in this market, stolen cellular phones must be disconnected from their initial purchasers' service plans. As result, sellers and resellers of stolen phones (who often operate at considerable

GOVERNMENT'S SENTENCING MEMORANDUM - 2
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

scale) typically unlock the phones. Once unlocked, the cellular phones are resold to customers, often overseas. As with customers unlocking their own phones, unlocking of stolen cellular telephones by participants in this illicit market results in cellular phone companies, such as AT&T, losing the remaining portion of the cost of the cellular telephones.

**B. Sapatin's Criminal Conduct in 2012-13**

In 2012, Marc Sapatin was working for AT&T as a customer service representative in AT&T's telephone call center in Bothell, Washington. *See* Presentence Report ¶ 9 [hereinafter, PSR]. As a customer service representative, Sapatin fielded telephone calls from customers and, among other things, had the ability to "unlock" customers' cellular telephones when the customers qualified to have the phones unlocked. See id.

Sapatin was contacted on Facebook by Muhammad Fahd, who identified himself only as "Frank." *See id.* ¶ 10. Fahd offered to pay Sapatin to unlock cellular telephones for Fahd, and Sapatin agreed to do so. *See id.* From approximately August 2012 until the Spring of 2013, Fahd sent Sapatin long lists of international mobile equipment identity numbers (IMEIs) for cellular telephones that Fahd wanted unlocked. *See id*. Sapatin submitted those lists to AT&T's unlocking system. *See id.* Fahd paid Sapatin substantial bribes (often $10,000 or more per week) to do this. Sapatin, who knew this was wrong, took a variety of steps to attempt to conceal his activity, such as using workstations other than his own to submit the requests. *See id.*

To increase the volume of cellular phones being fraudulently unlocked, Fahd asked Sapatin to recruit other employees to the scheme and offered to pay Sapatin for each recruit. *See id.* ¶ 11. Sapatin recruited another AT&T employee, Kyra Evans, who joined the scheme and began unlocking cellular telephones for Fahd. *See id.* (Sapatin also later recruited a friend, N.L., to begin working for AT&T with the specific intent of unlocking cellular phones for Fahd.)

GOVERNMENT'S SENTENCING MEMORANDUM - 3
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In the Spring of 2013, AT&T implemented a new unlocking system that prevented Sapatin from continuing simply to cut and paste lists of IMEIs into AT&T's unlocking system. *See id.* ¶ 12. As a result, Fahd hired a malware developer to develop malware that Sapatin and Evans could plant on their workstations to continue to unlock cellular telephones for him. *See id.* Sapatin provided Fahd confidential information about AT&Ts computer system and procedures to assist in the development of the malware. *See id.* Sapatin installed malware on AT&T computers to capture other employees' login credentials, to be used for unlocking. *See id.* Sapatin also installed and tested multiple versions of the unlocking malware on his workstation. *See id.*

When the malware ultimately was perfected in the late Spring of 2013, Sapatin installed the final version on his workstation. *See id.* From that point on, the malware operated in the background of Sapatin's workstation -- all Sapatin had to do was turn her computer on in the morning. *See id.* After that, Fahd communicated directly with the malware, using it to unlock large numbers of cellular telephones, without any further active involvement from Sapatin in the process. *See id.*

Sapatin and his co-conspirators unlocked an astounding number of phones for Fahd. Between 2012 and September 27, 2013, when AT&T discovered the unlocking scheme, the conspirators unlocked a total of 1,802,871 cellular telephones. *See id.* ¶ 17. Following AT&T's discovery of the unlocking scheme, Sapatin's employment at AT&T ended. *See id.* ¶ 14. As further explained in the Government's Filing Relating to Defendant's Sentencing, it appeared that Sapatin's involvement in the scheme had ended.

### C. Sapatin's Criminal Conduct in 2014-16

In fact, Sapatin was not finished committing crime. Sapatin remained in contact with Fahd. In 2014, Sapatin provided Fahd with a list of AT&T employees who Sapatin believe might be willing to continue unlocking telephones for Fahd. *See id.* ¶ 14. Included among these was DeVaughn Woods, an AT&T employee whom Sapatin had recruited to work for Fahd in 2013, while Sapatin still was employed at AT&T. *See id.* ¶ 11. Although Woods joined the scheme in 2013, Woods' primary role at that time was

GOVERNMENT'S SENTENCING MEMORANDUM - 4
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

not unlocking cellular telephones.  Rather, Woods assisted the scheme in other ways.  As a result, AT&T did not discover Woods' involvement, or fire him, in 2013.

After providing Woods' name to Fahd in 2014, Sapatin worked with Fahd to enable Woods to unlock cellular telephones for Fahd.  Sapatin traveled to Dubai to meet with Fahd and plan how continue the unlocking scheme, and he agreed to instruct Woods how to install routers and other devices on AT&T's network to give Fahd continuing access to AT&T's computer system.  *See id.* ¶ 16; Plea Agreement ¶ 8.  Sapatin, in fact, served as an intermediary between Fahd and Woods, providing Woods' devices, such as routers, to enable Woods to unlock cellular telephones for Fahd.  *See* PSR ¶ 15.  Sapatin remained re-involved in the scheme until 2016.

### D. The Overall Scheme

Between 2012 and 2016, Sapatin received $441,500 in bribe payments from Fahd.  *See* Plea Agreement ¶ 8.  (This was the most of any of the bribed employees.  By contrast, as reflected in their Plea Agreements, Evans received $280,200, and Woods received somewhat over $200,000.)

Bribed AT&T employees were just one part of the scheme.  The government expects to introduce evidence at Fahd's sentencing that Fahd received more than $5.1 million during the limited period for which it has been able to obtain records for illegally unlocking cellular telephones.  The government also expects to introduce evidence that consumers ultimately paid tens of millions of dollars to persons who operated the businesses that paid Fahd for these unlocks, and that marketed the unlocking service to the public.

As one would expect, the losses to AT&T were even greater.  AT&T has calculated that the loss that it suffered from the 1,900,033 customers whose cellular telephones were unlocked by Fahd, Sapatin, and their co-conspirators between 2012 and 2017, and who therefore failed to pay outstanding balances owed for the purchase of their cellular telephones, was $201,497,430.94.  *See* PSR ¶ 17.  Of note, $25,253,181.10 of this amount reflects losses for phones unlocked during 2014-17 – that is, cellular

GOVERNMENT'S SENTENCING MEMORANDUM - 5
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

telephones unlocked as a result of Sapatin's return to the unlocking scheme in 2014, *after* his initial detection, termination from AT&T, and contact with law enforcement. *See id.*

### III.  PRESENTENCE REPORT

Sapatin has a total offense level of 35, calculated as follows. (The only difference between the calculation below, and the calculation that the government expects will be contained in the final Presentence Report is that the government is not recommending an adjustment for leadership.)

| | | |
|---|---|---|
| Base Offense Level | 6 | USSG §§ 2S1.1(a)(1), 2X1.1, 2B1.1(a)(2) |
| Loss (more than $150 million) | +26 | USSG § 2B1.1(b)(1)(N) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(10)(C) |
| Unauthorized/counterfeit access devices | +2 | USSG § 2B1.1(b)(11)(B) |
| Conviction under 18 U.S.C. § 1956 | +2 | USSG § 2S1.1(b)(2)(A) |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |
| **Total Offense Level** | **35** | |

#### A. Base Offense Level

Sapatin's two counts of conviction are grouped pursuant to Section 3D1.2 of the Sentencing Guidelines, because they involve transactions connected by a common scheme or plan, and because the guideline for his conspiracy is an adjustment to the guideline that determines his offense level for money laundering.

Specifically, pursuant to Section 2S1.1(a), Sapatin's base offense level for his money laundering offense is "[t]he offense level for the underlying offense from which the laundered funds were derived," that is, conspiracy to commit wire fraud and computer fraud. Pursuant to Section 2X1.1, the offense level for that conspiracy is the same as the offense level for actual fraud. The offense level for the actual fraud is determined by Section 2B1.1. And, that section establishes a base offense level of six. *See* U.S.S.G. § 2B1.1(a)(2).

GOVERNMENT'S SENTENCING MEMORANDUM - 6
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### B. Loss Amount

Sapatin's offense level is increased by 26 levels based upon a loss of more than $150,000,000. *See* § 2B1.1(b)(1)(N). As noted above, AT&T's loss was $201,497,430.94.[1] Even if the Court were to question this calculation, the Court still should apply a 26-level adjustment, based upon comment 3(F)(1) to Section 2B1.1. That comment provides that, in a case involving counterfeit or unauthorized access devices that are telecommunications instruments or accounts (such as the IMEIs of the cellular telephones illegally unlocked in this case), the loss "shall not be less than $100 per [access device]." Multiplying the 1,900,033 cellular telephones illegally unlocked by $100 results in a loss of $190,003,300, which yields the same 26-level increase for loss amount.

### C. Sophisticated Means

Section 2B1.1(b)(10) provides a two-level increase where "a substantial part of the fraudulent scheme was committed from outside the United States" or "the offense otherwise involved sophisticated means." *Id.* Here, Fahd directed the scheme from Pakistan, and the scheme, which involved the placement of custom-designed malware onto AT&T's computer system, was extremely sophisticated. As a result, the adjustment applies.

### D. Unauthorized/Counterfeit Access Devices

Section 2B1.1(b)(11)(B) provides that a defendant's offense level should be increased by two levels where an offense involves trafficking in unauthorized or counterfeit access devices. Here, by fraudulently unlocking IMEIs, Fahd and Sapatin trafficked in unauthorized or counterfeit access devices. *See* U.S.S.G. § 2B1.1 comment.

---

[1] The Government does not believe that Sapatin is challenging AT&T's loss calculation in this case, since he has not given any indication that he is doing so. Moreover, the Court already has accepted the calculation in sentencing Evans and Woods. The Government expects that loss amount will be litigated by at least Fahd. If Sapatin does in fact wish to challenge AT&T's calculation, and if the Court is inclined to entertain that challenge, the Government would ask the Court to continue Sapatin's sentencing to allow the Government to present evidence concerning loss amount, rather than making a finding that could negatively affect Fahd's sentencing.

GOVERNMENT'S SENTENCING MEMORANDUM - 7
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

n.10(A) (providing that "counterfeit access device" and "unauthorized access device" have the meanings given those terms in 18 U.S.C. § 1029(e)(2) and (3), and that the term counterfeit access device "includes a telecommunication instrument that has been altered to obtain unauthorized use of telecommunications service."). As a result, this adjustment applies.

### E.  Conviction Under 18 U.S.C. § 1956

Because Sapatin's conviction for money laundering was a conviction "under 18 U.S.C. § 1956," Sapatin's offense level is increased by two levels.

Thus, Sapatin has an offense level, prior to acceptance of responsibility of 38. That is decreased by three levels, based on Sapatin's acceptance of responsibility, *see* U.S.S.G. § 3E.1., resulting in a total offense level of 35. With an offense level of 35 and a criminal history category of I, Sapatin has an advisory sentencing range of 168-210 months.

## IV.  SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Sapatin to 48 months' (that is, four years') imprisonment, based upon the factors set forth in 18 U.S.C. §3553(a) and on the facts set forth in this memorandum and in the Government's Filing Concerning Defendant's Sentencing.

**1.    "The nature and circumstances of the offense" and "the history and characteristics of the defendant."**  Sapatin has committed an extremely serious offense. For more than a year, while working at AT&T, he betrayed AT&T's trust. He took more than $400,000 of bribes in order to unlock cellular telephones, knowing that this would harm AT&T. He first unlocked cellular telephones himself. When AT&T blocked him from doing that, he shared information about AT&T's policies and computer system, harvested and shared other employees' login credentials, and assisted in the development of malware designed to be planted on AT&T computers to unlock cellular telephones. He ultimately planted malware on his workstation for that purpose.

GOVERNMENT'S SENTENCING MEMORANDUM - 8
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sapatin's conduct was not limited to his own exploitation of AT&T's trust. Sapatin recruited other, existing AT&T employees, namely, Evans and Woods to participate in the scheme. Sapatin even enlisted a friend, N.L., to apply to work at AT&T for the sole purpose of joining the scheme and earning bribe payments by fraudulently unlocking cellular telephones. And it was not a one-time mistake: rather, it was an extended course of conduct. By the time he installed the malware on his computer, Sapatin was cheating his employer all day every day that he was at work.

Even more troubling, Sapatin's conduct extended beyond the time that he was employed at AT&T. Sapatin's, Evans', and N.L.'s unlocking was discovered in 2013. Following that discovery, Sapatin's termination, and events described in the Government's Filing Regarding Defendant's Sentencing, Sapatin appeared to have ended his involvement in the scheme. Yet, roughly a year later, Sapatin returned to exactly the same criminal conduct. Sapatin assisted Fahd in recruiting another AT&T employee, Woods, whose involvement had not been detected in 2013, to begin unlocking cellular telephones for Fahd. And Sapatin facilitated that continued unlocking by serving as an intermediary between Fahd and Woods and providing equipment and instruction to Woods to perform that unlocking. Sapatin remained involved for two more years, until 2016.

The impact of Sapatin's crime on AT&T was massive. Sapatin and his co-schemers illegally unlocked more than 1.9 million cellular telephones. The loss to AT&T was, predictably, immense. AT&T calculates it at more than $201 million. And this should not be discounted as simply a loss to a large corporation. AT&T, like other corporations, incorporates fraud losses in setting prices for its product and services. Each AT&T customer across America ultimately bore (or bears) a small portion of this loss in the form of higher cellular telephone prices. To the extent the loss was not passed on, it ultimately fell on AT&T shareholders, any of them individuals or pension funds.

Although, Sapatin does not have prior criminal convictions, the unique facts of Sapatin's case raise significant concerns not present for other first-time offenders.

GOVERNMENT'S SENTENCING MEMORANDUM - 9
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sapatin's criminal conduct was detected in 2013. Following events described in the Government's Filing Regarding Defendant's Sentencing, Sapatin appeared to have ceased his criminal conduct. Sapatin was not immediately charged, because the government was attempting to identify Fahd and did not want to reveal facts concerning its investigation. Yet rather than use what appeared to be an opportunity to begin to rehabilitate himself, a year later Sapatin jumped back into crime. Sapatin's deliberate reinvolvement in the unlocking scheme – which resulted in more than $25 million of loss – makes him particularly culpable, despite his lack of prior convictions.

**2.  The need for the sentence to "reflect the seriousness of the offense," "to provide just punishment," "to afford adequate deterrence," and "to protect the public."** As noted above, Sapatin's crime is extremely serious. Sapatin took hundreds of thousands of dollars of bribes to act in ways that caused hundreds of millions of dollars of losses to AT&T, including planting malware on his work computer, and recruiting other employees to participate in the scheme. Sapatin and his co-schemers ultimately caused more than $200 million of losses to AT&T, losses that inevitably were borne by other customers and AT&T's shareholders. In short, Sapatin's conduct was egregious, and his crime substantial. For both reasons, a significant punishment is needed to reflect the seriousness of the crime, to deter others, and to maintain respect for the law.

**3.  The sentencing range.** As noted above, Sapatin's sentencing range is 168-210 months. Even if one were to excuse Sapatin's conduct during 2012-13 as a sort-of "first-time offense," and Sapatin were being sentenced only for his conduct after he rejoined the scheme and the concomitant $25 million loss, Sapatin would have a sentencing range of 108-135 months. The sentence that the Government is recommending, a 48-month term of imprisonment, is obviously far below either range.

**4.  The need to avoid unwarranted sentence disparities among defendants.** The Court already has sentenced two defendants in this case, Kyra Evans and DeVaughn Woods, and sentenced each to probation. Sapatin is in a very different position than either of those defendants, and he should receive a far more substantial sentence. Sapatin

GOVERNMENT'S SENTENCING MEMORANDUM - 10
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

was the first employee to work for Fahd. Sapatin recruited the other AT&T employees, including Evans, Woods, and N.L., to join the scheme. Sapatin received far more money from the scheme than Evans, Woods, or N.L.

Most troubling, Sapatin is the only employee who was detected by AT&T and law enforcement in 2013, who purported to be no longer involved in the scheme, and yet who then deliberately returned to the scheme. Sapatin's decision to return to crime, after events that should have precluded any further involvement in the scheme, cannot be ignored. It rebuts any possible argument that Sapatin did not realize the seriousness of his criminal conduct, and it merits a substantial punishment.

There is, of course, no question that Fahd's conduct, as the organizer of the scheme, is more serious. And, consistent with its plea agreement with Fahd, the Government expects to recommend a 15-year sentence of imprisonment for Fahd. But Sapatin's case also calls for a substantial, albeit lesser, term of imprisonment. The 48-month sentence the government is recommending for Sapatin will avoid unwanted disparity between all the defendants and will appropriately reflect the defendants' different roles and conduct.

**5.     Recommendation.**  In sum, Sapatin has committed an extremely serious crime, extending over a long period, and that resulted in a massive financial loss to its victim. The seriousness of the crime is compounded by Sapatin's return to the crime in 2014, a year after his initial detection and involvement with law enforcement. A 48-month sentence will appropriately punish Sapatin for his crime in light of all of the factors set forth in 18 U.S.C. § 3553(a).

## V. RESTITUTION AND FORFEITURE

Sapatin agreed in his Plea Agreement to pay $441,500 of apportioned restitution to AT&T, which shall not be joint and several with any other defendant's restitution obligation. The Government also has filed a motion for entry of an order of forfeiture for a money judgment in that amount.

GOVERNMENT'S SENTENCING MEMORANDUM - 11
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## VI.  CONCLUSION

For the foregoing reasons, the Court should sentence Sapatin to 48 months' imprisonment.  The Court also should order Sapatin to pay $441,500 in restitution, should waive a fine based upon Sapatin's inability to pay, should order Sapatin to pay a $200 penalty assessment, and should enter an order of forfeiture for a $441,500 money judgment.

DATED:  this 3rd day of September 2021.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*s/ Andrew C. Friedman*
ANDREW C. FRIEDMAN

*s/ Francis Franze-Nakamura*
FRANCIS FRANZE-NAKAMURA

Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-7970
Fax: (206) 553-0882
E-mail: Andrew.Friedman@usdoj.gov
        Francis.Franze-Nakamura@usdoj.gov


s/ Anthony Teelucksingh
ANTHONY TEELUCKSINGH
Trial Attorney
Computer Crime & Intellectual Property Section
Department of Justice
1331 New York Avenue, N.W.
Washington, D.C.  20530
Phone: (202) 353-4779
E-mail: Anthony.Teelucksingh@usdoj.gov

GOVERNMENT'S SENTENCING MEMORANDUM - 12
*United States v. Sapatin,* CR18-255 RSL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970